*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TERRY LESTER BUNDY,

        Defendant-Appellant.

UNPUBLISHED
February 1, 2022

No. 349072
Lenawee Circuit Court
LC No. 18-018845-FC

Before: K. F. KELLY, P.J., and STEPHENS and CAMERON, JJ.

PER CURIAM.

Defendant appeals as of right his convictions after a jury trial of two counts of first-degree criminal sexual conduct (CSC-I).[1] The trial court sentenced defendant as a fourth-offense habitual offender to 50 to 90 years' imprisonment for each conviction. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS

Defendant was convicted of sexually assaulting AB, who was seven years old at the time of trial. AB had three other half-siblings. AB's mother led and encouraged AB to believe that defendant was her father. Thus, when AB's older sibling, who was defendant's biological child, had weekend visitations with defendant, four-year-old AB accompanied her. At the time, defendant was living at a home with his mother and his mother's boyfriend. AB testified that during these visits, she would sleep in the same bed as defendant and her sibling would sleep in the living room.

On Saturday, August 6, 2017, after a visitation with the defendant, AB complained that her "coochy" hurt. Upon examination, AB's mother thought the genital area looked more "raw," akin to a skinned knee as opposed to appearing like a typical rash and applied some anti-rash ointment or cream to the area. She asked AB if anybody had touched her there and AB responded that defendant had touched her.

---

[1] The jury acquitted defendant of four additional counts of CSC-I.

The redness and rawness on AB were essentially gone the following day when AB's mother took AB to the Hillsdale Hospital emergency room. After a long wait, the mother left Hillsdale and transported AB to another hospital in Coldwater. AB was seen by a physician who diagnosed her with a urinary tract infection and prescribed her antibiotics. Also while at one of the hospitals, with a nurse's assistance, AB's mother took a picture of AB's genital area with her cell phone.[2] The mother expected both a police officer and a Child Protective Services worker to meet them at the second hospital, but neither ever arrived.

The mother testified to the events that occurred from the time she retrieved AB from her visitation with the defendant up until the time of trial, including all medical examinations. At trial, AB was called to testify, but when asked about anything related to defendant and going to defendant's home, she asserted a lack of memory. The prosecutor moved to have AB declared "unavailable" and to have her prior testimony from the preliminary examination read into the record under MRE 804(a)(3) and MRE 804(b)(1). Despite defense counsel's objection, the trial court declared AB unavailable and allowed AB's preliminary examination testimony to be read into the record.

The transcript from the preliminary examination recorded AB's testimony that defendant had hurt her with his "bad spot." Specifically, she testified that defendant used his "bad spot" to hurt her "bad spot." AB identified the groin area as the location for both her and defendant's bad spots and mentioned that bad spots are used for "peeing." AB described what defendant's bad spot looked like and testified to multiple incidents of penetration.

The prosecution also called Dr. Carla Parkin-Joseph, a pediatrician at the University of Michigan where AB's mother brought AB to be evaluated on August 15, 2017, which was 10 days after defendant's visitation with AB. Parkin-Joseph conducted an examination of AB but found no bruising, no irritation, and no signs of trauma.[3] Parkin-Joseph reported that the internal examination of AB was "completely normal." Despite these findings, Parkin-Joseph testified that her medical diagnosis was that AB had been sexually abused. She stated that her diagnosis was based on the reports she received from AB's mother and her knowledge that it was not unusual for children to show no signs of trauma after being sexually abused. Parkin-Joseph also provided a statistic that 95% to 96% of children who have been "confirmed"[4] victims of sexual abuse have normal examinations. On cross-examination, Parkin-Joseph testified that if she put aside the mother's information and considered only her examination of AB, the best that could be said is that she could not exclude the possibility that a sexual assault had happened.

Detective Sergeant Nathan Horan from the Michigan State Police (MSP) testified regarding his interview of defendant. Horan testified that he "conduct[ed] interviews for [MSP's] biometrics and identification division." He explained that during defendant's interview, defendant initially denied any wrongdoing and maintained that he had no contact with AB's groin area except for two occasions when AB defecated in her pants and defendant had to clean up the area. Horan testified that he told defendant that he did not feel that defendant was being completely truthful. Subsequent to that statement, defendant admitted putting his hand down AB's underwear and touching her bare genitalia after she had fallen asleep

---

[2] It was not clear whether the photograph was taken at Hillsdale or at Coldwater.

[3] Parkin-Joseph only examined AB; she did not question or interview AB.

[4] She explained that "confirmed" cases were those in which the alleged perpetrator was criminally convicted.

to check to see if she had wet the bed.  Horan stated that he asked defendant how long his finger had lingered on AB.  Defendant eventually admitted that he should not have kept his finger there as long as he did, but denied any penetration.  Defendant also acknowledged to Horan that keeping his finger on AB longer than he should have was a mistake and that he felt sick for doing it.  Horan opined that the more he and the defendant talked, the more evasive defendant's responses were.  Horan testified that when he directly asked the defendant what level of truthfulness he was demonstrating, defendant replied, "98 percent."

The jury convicted defendant of two counts of CSC-I (one count of penile penetration and one count of digital penetration), but acquitted him of four other counts of CSC-I (two counts of penile penetration and two counts of digital penetration).  He was sentenced to 50 to 90 years' imprisonment for each conviction.  This appeal followed.

## II.  ADMISSION OF PRIOR TESTIMONY

Defendant first argues that the trial court erroneously ruled that AB was unavailable and allowed her preliminary examination testimony to be read into the record.  We disagree.

This Court reviews a trial court's finding that a witness was unavailable for clear error.  See *People v Briseno*, 211 Mich App 11, 14; 535 NW2d 559 (1995).  A court clearly errs when a reviewing court is left with a definite and firm conviction that a mistake has been made.  *People v Allen*, 295 Mich App 277, 281; 813 NW2d 806 (2011).  This Court reviews preserved evidentiary issues for an abuse of discretion.[5] *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001).  A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes.  *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008).

While out-of-court statements offered to prove the truth of the matter asserted are generally inadmissible under MRE 801(c) and MRE 802, there is an exception under MRE 804(a)(3) for inadmissible hearsay.  Under MRE 804(a)(3), a witness is unavailable if the witness "has a lack of memory of the subject matter of the declarant's statement."  When a witness is unavailable, MRE 804(b)(1) allows for the admission of the witness's

> [t]estimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

In this case, the prosecutor asked AB many questions related to the allegations involving defendant, but each time AB claimed a lack of memory:

---

[5] We reject the prosecution's contention that defendant waived this issue when defense counsel chose not to cross examine AB at trial.  Waiver is the "intentional relinquishment or abandonment of a known right." *United States v Olano*, 507 US 725, 733; 113 S Ct 1770; 123 L Ed 2d 508 (1993).  Defense counsel's objection to AB being declared unavailable at trial negates any intention by counsel to waive or abandon the issue for appeal.

*Q.* Do you remember when [your brother] would go spend the night at [defendant's] house?

*A.* No.

*Q.* Do you remember when you went to spend the night at his house?

*A.* No.

*Q.* Do you remember the part where we were only going to talk about the truth? Remember that part?

*A.* Yes.

*Q.* Okay, and is it true that you don't remember going over to his house?

*A.* Yes.

*Q.* Do you remember if [defendant] did anything bad to you?

*A.* No.

*Q.* Do you like talking about [defendant]?

*A.* No.

*Q.* Do you know why you don't like talking about [defendant]?

*A.* No.

*Q.* Do you want to talk about [defendant] anymore today?

*A.* No.

*Q.* If I ask you more questions about [defendant], is that going to make you sad?

*A.* No, mad.

*Q.* Mad. Okay. So now, do you remember coming to the courthouse before to talk like you are right now?

*A.* No.

*Q.* You don't remember coming to the courthouse and seeing me before and talking?

*A.* Yes.

*Q.* You do remember?

*A*. Yes.

*Q*. Okay. Do you remember when you talked about [defendant] or was it something different?

*A*. I don't know.

*Q*. So can you remember anything about what happened when you lived at [defendant's] house sometimes?

*A*. No.

On appeal, defendant focuses on questions not directly pertaining to AB's memory, such as whether AB wanted to talk about defendant or whether AB would be "sad" if the questioning continued. The defense argument focuses on *People v Duncan*, 494 Mich 713; 835 NW2d 399 (2013). *Duncan* involved the mental-infirmity exception found under MRE 804(a)(4), and not the lack-of-memory aspect of unavailability in MRE 804(a)(3). In *Duncan*, the child witness responded that she did not know the difference between the truth and a lie. 494 Mich at 727. The witness also was so distraught that she was in tears and wringing her hands during questioning, "rendering her unable to answer counsels' questions." *Id*. at 728. The concurring opinion went into detail about the efforts the trial court had made to ascertain if the witness understood the difference between the truth and an untruth. See *id*. at 735-736 (MARKMAN, J., concurring). But even then, the concurring opinion had not suggested that a trial court must make the same type of inquiries or that there must be multiple attempts to get the witness qualified to testify. Justice MARKMAN noted that after the trial court initially could not get the witness to respond satisfactorily regarding whether she understood the difference between the truth and a lie, the court took a 40-minute recess "presumably to calm her down" and then questioned the witness again. *Id*. Notably, the witness had been exhibiting a high degree of stress and anxiety, which was affecting her ability to differentiate between a truth and a lie. Indeed, it was this stress and anxiety that the majority held constituted a mental infirmity under MRE 804(a)(4). *Id*. at 728. In contrast here, seven-year-old AB indicated she knew the difference between a truth and a lie; thus, she demonstrated competency. The record does not reflect like in *Duncan*, that she was generally in distress.

AB was seven years old at the time of trial and was asked to recall events that happened one to two years prior when she was five or six years old. When the child witness repeatedly answered that she could not remember, the prosecutor did not give up, but pressed the child by reminding the child that she promised to tell the truth. The prosecutor asked AB not only about the actual events for which defendant was charged but about surrounding events aimed at triggering the child's memory. The fact that these multiple attempts failed led to the request to declare the witness unavailable. Contrary to defendant's position on appeal, there is nothing in the rule of evidence or any legal authority that defendant has identified that requires the trial court to make an independent inquiry of a witness before declaring that she is unavailable on account of a lack of memory.

Neither does the record suggest that any further questioning or actions by the trial court might have enabled AB to recall those events for which she lacked memory. Consequently, the trial court did not

clearly err by finding that AB had a lack of memory regarding the subject matter of her prior statement, nor abuse its discretion in admitting AB's preliminary examination testimony.[6]

Defendant further argues that the admission of AB's prior testimony denied him his right to confrontation. We disagree. Because defendant did not advance this argument below, we review this unpreserved constitutional issue for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). To succeed with his claim, defendant must show that an error occurred, the error was plain or obvious, and the error affected defendant's substantial rights. *Id*. at 763. This "third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. It is defendant who has the burden of persuasion with respect to prejudice. *Id*.

Contrary to defendant's implication, defendant's right to confrontation was not violated. In *People v Sardy (On Remand)*, 318 Mich App 558; 899 NW2d 107 (2017), this Court observed:

> In *Crawford* [*v Washington*, 541 US 36, 59 n 9; 124 S Ct 1354; 158 L Ed 2d 177 (2004)], the United States Supreme Court noted that when a declarant appears at trial for cross-examination, the Confrontation Clause does not place any restraints on the use of a prior testimonial statement, and that the Clause does not bar the admission of a prior testimony statement "so long as the declarant is present at trial to defend or explain it." The language in this footnote has been construed "to mean that even a witness with no memory of the events in question is nevertheless present and available for cross-examination" for Confrontation Clause purposes. [*Sardy*, 318 Mich App at 563 (citations omitted).]

Thus, "a declarant who appears at trial but claims memory loss is 'available' for purposes of the Confrontation Clause, even though our hearsay rules provide that a declarant is unavailable when the declarant 'has a lack of memory of the subject matter of the declarant's statement[.]' " *Sardy*, 318 Mich App at 565, quoting MRE 804(a)(3). In this case, AB was present at trial and could have been cross-examined regarding her prior testimony and her present lack of memory. Defense counsel, however, chose not to cross-examine AB. Accordingly, to the extent that defendant argues that he was denied the right of confrontation, he has failed to show any constitutional error, let alone any constitutional error that was plain or obvious.

## III. FOUNDATION FOR PHOTOGRAPH

Defendant next argues that there was an insufficient foundation to admit at trial the prosecution's proffered photograph of AB's genital area. Defendant argues that because the photograph was taken from a cell phone, the best evidence to authenticate the photograph was not the testimony of AB's mother who

---

[6] We note that defendant's argument in the trial court that AB was not unavailable because she only claimed a lack a memory related to the events with defendant and not a lack of memory regarding her making her prior statements at the preliminary examination misconstrues the requirements of the rule. A witness only has to have a lack of memory with respect to "the subject matter of the declarant's statement"; it does not require a lack of memory about making a prior statement regarding the subject matter. See MRE 804(a)(3).

took the photo, but the photo's "metadata," which would show various information related to the digital file, including when it was taken. This contention is slightly different from the one argued by defendant at trial. At trial, defendant objected to the photograph's admission based on lack of authentication under MRE 901 (the absence of a date on the photo), and not the best evidence rule, MRE 1002. "To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *Aldrich*, 246 Mich App at 116. Because defendant did not object on the same ground at trial as he does on appeal, we review this unpreserved evidentiary issue for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763-764; *Aldrich*, 246 Mich App at 113.

MRE 901(a) governs the authentication of evidence. It provides that the "authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." MRE 901(a). MRE 901(b) provides "examples of authentication or identification conforming with the requirements of this rule," including "[t]estimony that a matter is what it is claimed to be." MRE 901(b)(1). In this instance, AB's mother testified that she took the photograph in question of AB's genital area on Monday, August 7, 2017, while at the hospital. Defendant's only objection was that without a digital date stamp on the photograph, there was no way to tell when it actually was taken. But, as defendant concedes, MRE 901 clearly does not require anything more than a witness's testimony to establish the requisite foundation, and AB's mother fulfilled that requirement.

Nevertheless, defendant argues on appeal, without any authority, that a proponent of digital evidence should be required to supply the metadata as the best evidence for authenticating digital photographs. MRE 1002, colloquially known as "the best-evidence rule," provides that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute." However, under MRE 1003, "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Defendant's preference for a date stamp did not create a genuine issue as to the authenticity of the original photograph. The jury was otherwise well positioned to evaluate the credibility of the authenticator. See *People v Wolf*, 440 Mich 508, 514-515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). Thus, the trial court did not err when it admitted the photo into evidence.

IV. DETECTIVE HORAN'S TESTIMONY

Defendant raises several issues related to Horan's testimony.

A. IMPLIED USE OF A POLYGRAPH

Defendant first argues that it was improper for Horan to have provided testimony that indicated to the jury that defendant had failed a polygraph test. There was no direct evidence that a polygraph was administered. At no time did Horan testify to any polygraph results. Because this contention is without record support, we reject it. Further, defendant never objected to Horan's testimony on this ground at trial. Therefore, this issue is unpreserved and is reviewed for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763-764.

Our Supreme Court has established a bright-line rule that evidence related to polygraph examinations is inadmissible in a criminal trial. *People v Jones*, 468 Mich 345, 355; 662 NW2d 376 (2003); see also *People v Barbara*, 400 Mich 353, 411; 255 NW2d 171 (1977) ("[T]he state of the art does not warrant the introduction of polygraphic tests into evidence in a trial."). At trial, Horan stated that he "conduct[ed] interviews for the biometrics and identification division" of the MSP. He also described the process he followed for interviews, which included building a rapport with the individual and making sure the person was "of sound mind, sound body and that [the person] can correct false assumptions." He described it as "like if you're doing a forensic interview . . . with a younger child, if I get something wrong, I expect them to correct me." Horan explained that after he heard defendant initially deny any wrongdoing, he told defendant that he did not feel that defendant was being "completely truthful" with him. Horan testified that it was at that point that defendant admitted to touching AB's bare genital area with his hand for the purported purpose of seeing if she had wet the bed.

With no authority, defendant asserts on appeal that "[i]t does not take much experience to know" that Horan had described "a perfect outline of a polygraph examination." We disagree. The fact that the jurors were notified that Horan worked within the Biometrics and Identification Division of the MSP was insufficient to convey to them that Horan had administered a polygraph examination to defendant. The term "biometrics" is not precise enough for it to implicate polygraph testing. Biometrics is defined as "the measurement and analysis of unique physical or behavioral characteristics (as fingerprint or voice patterns) esp. as a means of verifying personal identity." *Merriam-Webster's Collegiate Dictionary* (11th ed). Thus, under a current definition of "biometrics," the field of polygraphs is not directly implicated. Instead, processes like fingerprints or voice patterns are and, more specifically, how they are used to verify personal identity. Importantly, Horan did not testify that he was a polygraph examiner nor that a polygraph was done in this case. Horan testified that he conducted interviews. He mentioned forensic interviews, analysis of handwriting samples, and to having taken the equivalent of a "master level" course in psychology that covered "behavior-based interview techniques." Horan's testimony was limited to his interview of defendant, the techniques he used during that interview, and his assessment of defendant's behavior in response. Thus, there was nothing in Horan's testimony that would have put the jury on notice that any techniques utilized by him were for conducting a polygraph examination.

The strongest argument defendant makes in support of the assertion that Horan's testimony prejudiced him by implicating failure of a polygraph test was the testimony regarding 98% truthfulness. However, Horan never ascribed a value to the level of defendant's truthfulness during the interview. Rather, it was defendant who disclosed to Horan that he was being "about" 98% truthful about what had occurred between him and AB. The admission of the defendant does not give him safe harbor to argue that Horan impermissibly injected the forbidden polygraph evidence into the record.

Accordingly, with Horan not making any express reference to any polygraph testing and there being no obvious implication that such testing had taken place, there is no evidence in the record to show any plain error that affected defendant's substantial rights.

B. PROSECUTORIAL MISCONDUCT

Defendant, in a Standard 4 brief,[7] also argues that the prosecutor committed misconduct by eliciting testimony from Horan that commented on defendant's credibility. We disagree.

"We review claims of prosecutorial misconduct case by case, examining the remarks in context, to determine whether the defendant received a fair and impartial trial." *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001). Because defendant did not object to Horan's testimony on this ground at trial, we review this unpreserved issue for plain error affecting defendant's substantial rights. *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Carines*, 460 Mich at 763. "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*.

A prosecutor has the right to introduce evidence that he or she legitimately believes will be accepted by the trial court. *People v Noble*, 238 Mich App 647, 660-661; 608 NW2d 123 (1999). As a result, a claim of prosecutorial misconduct cannot be predicated on a good-faith effort to admit evidence. *People v Dobek*, 274 Mich App 58, 70; 732 NW2d 546 (2007); see also *Noble*, 238 Mich App at 661.

Defendant argues that the following four instances of questions posed to and answers given by Horan attacked defendant's credibility and bolstered AB's credibility.

1)      *Q*. And prior to him arriving, did you have knowledge, general knowledge of what he was alleged to have done?

*A*. Yes, ma'am.

*Q*. Okay, so you had that information to be able to confront him with.

*A*. Yes, ma'am.

*Q*. Okay. And did he make any notable statements to you in regards to those allegations?

*A. Yes, ma'am. He—he spent a lot of time not so much denying the allegations but more convincing me—or attempting to convince me as to why he would not do those allegations.* [Emphasis added].

2)      *Q*. Did he tell you it happened—where it when she pooped her pants or where she was when she pooped her pants?

*A*. I don't recall, I'm sorry.

[7] A pro se brief filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4.

*Q*. Okay. After that period of time of denial of any of him ever touching her other than for when she pooped her pants, did she—did he make any other notable statements to you?

*A. We did get to the point where I told him based on just my interview with him, I did not feel he was being truth—completely truthful with me.* [Emphasis added].

3) *Q*. Was there anything else that was stated during the interview from [defendant] that was notable to you[?]

*A. They try to minimize their involvement to that or project some of the blame on to the victim or somebody else to the point where even the—the truth that-I get to the matter—matter at hand, it's never the complete truth—and I did indicate that to [defendant] that I felt that that's where we were.* [Emphasis added].

4) *Q*. All right. And if I heard you correctly, your interview starts out getting to know him, you're introducing certain conversation techniques in order to build a rapport with him.

*A*. Correct.

*Q*. Then later you switch over to what's called an interrogatory style? Isn't that the word you used?

*A*. That's what I said, yes.

*Q*. And that's where you're accusing him of doing something wrong.

*A. I told him that I did not believe he was telling me the truth.* [Emphasis added].

When read in context, the italicized portions of Horan's testimony in instances #1, 2, and 3, demonstrate the prosecutor's good faith effort to elicit the details of Horan's interview with defendant. The prosecutor never asked Horan about his views of defendant's truthfulness during the interview; instead, Horan, on his own volition, offered his views from the interview to explain why he asked certain questions and to generally explain the course of the interview.

Instance #4 exemplifies an unresponsive answer. "Unresponsive answers from witnesses are generally not prosecutorial error." *People v Jackson*, 313 Mich App 409, 427; 884 NW2d 297 (2015). "As a general rule, unresponsive testimony by a prosecution witness does not justify a mistrial unless the prosecutor knew in advance that the witness would give the unresponsive testimony or the prosecutor conspired with or encouraged the witness to give that testimony." *Id*. (citation omitted). There is no evidence that the prosecutor knew Horan would respond as he did or that the response was encouraged. The prosecutor asked a question to clarify the interrogatory style of questioning, which called for a yes or no response, and Horan responded instead with something he told defendant during a specific point of the interview.

To the extent that defendant argues that Horan's statements were inadmissible, defendant also is not entitled to any relief. "It is generally improper for a witness to comment or provide an opinion on the

credibility of another witness, because credibility matters are to be determined by the jury." *Dobek*, 274 Mich App at 71. In *People v Musser*, 494 Mich 337, 353-354; 835 NW2d 319 (2013), the Court held

> that where the proponent of the evidence offers an interrogator's out-of-court statements that comment on a person's credibility for the purpose of providing context to a defendant's statements, the interrogator's statements are only admissible to the extent that the proponent of the evidence establishes that the interrogator's statements are relevant to their proffered purpose.

In the instant case, although the information was elicited during an examination by the prosecutor, it does not appear that the prosecutor was actually seeking this information. Instead, Horan provided these answers when he was simply asked what notable statements defendant made during the interview, and there were no objections to which the prosecutor had to provide any such justification for the comments. For this plain-error analysis, we conclude that the purpose was merely to provide context for Horan's questions and defendant's answers during the interview. Therefore, they were "admissible to the extent that the proponent of the evidence establishes that the interrogator's statements are relevant to their proffered purpose." *Id.* at 354. In this case, Horan's statements regarding his thoughts on defendant's truthfulness during the interview were relevant for the proffered purpose. Again, the statements clearly explained why Horan followed up with his particular questions and provide context for defendant's subsequent answers.

Moreover, assuming arguendo that Horan impermissibly commented on defendant's credibility at the time of his interview, any error did not affect defendant's substantial rights. During the early portions of defendant's interview, defendant denied any contact with AB's genital area, except for two occasions when he touched AB "below the belt line" because she had "pooped her pants," as defendant put it. Horan explained that he did not think defendant was being truthful, at which point defendant confirmed Horan's suspicions. As Horan explained:

> We did get to the point where I told him based on just my interview with him, I did not feel he was being truth—completely truthful with me [that he had only touched AB below the belt line on two occasions when she had had an accident]. At this point in time we continued to talk about that, and he stated he did put his hand down the victim's pants and touched her bare vagina, maintaining that he did this after she had fallen asleep to make sure she had not wet the bed.

Horan also explained that when he asked defendant what level of truthfulness he was demonstrating, defendant responded "98 percent," which obviously is less than the full truth.

Thus, even if Horan had not commented on the fact that he thought that defendant was not being completely forthright, defendant's own admissions confirmed that he had indeed not been completely truthful during the interview. Not only did defendant later admit that he had touched AB's bare genital area (after initially denying ever touching her there), he also admitted to being less than 100% truthful and admitted that he had kept his finger in AB's underwear longer than he should have and expressed feeling remorseful or guilty about doing so.

Defendant also argues in his Standard 4 brief that the prosecutor committed misconduct by eliciting other-acts evidence from Horan. This issue is unpreserved because defendant did not object to

the challenged testimony at trial. *Aldrich*, 246 Mich App at 116. Accordingly, to be entitled to relief, defendant must demonstrate a plain error affecting his substantial rights. *Carines*, 460 Mich at 763.

During Horan's direct examination by the prosecution, the following exchange occurred:

> *Q*. [D]id [defendant] make any notable statements to you in regards to those allegations [related to sexually assaulting AB]?
>
> *A*. Yes, ma'am. He—he spent a lot of time not so much denying the allegations but more convincing me—or attempting to convince me as to why he would not do those allegations. Specifically that *he has attended a lot of sexual therapy courses in the past. He has both physical and mental barriers throughout his life to make sure he is not put in that type of situation with a victim and that what was being alleged did not occur*. [Emphasis added.]

Additionally, in regard to defendant having admitted to checking whether AB had wet the bed by putting his hand in her underwear, touching her bare genital area, and leaving his finger there longer than needed, Horan stated:

> I asked if he had talked to anybody else, and he—he initially stated that he had talked to his girlfriend about it. We then talked about that more. That seemed to not be the case that he had talked to anybody about it. Further indicating to me that based—*based on his past and who he is*, that if people knew what had—had occurred, they would immediately believe that to be a sexual contact. [Emphasis added.]

Defendant claims that these italicized references to his prior acts were inadmissible, not noticed, and deprived him of a fair trial. Evidence of prior acts are not admissible to prove that the person acted in conformity with those past acts. MRE 404(b)(1). The prosecutor must give notice of the intent to offer other-acts evidence under MRE 404(b)(2). MRE 404(b) "represents the deeply rooted and unwavering principle that other-acts evidence is inadmissible for propensity purposes." *People v Denson*, 500 Mich 385, 397; 902 NW2d 306 (2017). However, as long as the other-acts evidence was not offered for propensity purposes, it does not run afoul of this rule. *People v Johnigan*, 265 Mich App 463, 465; 696 NW2d 724 (2005).

The record does not support that the prosecutor intended to admit the other-acts testimony under MRE 404(b). No notice of intent was filed and no motion was made at trial. Neither is there evidence that Horan's statements were elicited to prove that defendant acted in conformity with any prior acts. The prosecutor's questions to Horan were general and there was no indication that the prosecutor knew that Horan would answer the questions in the manner he did. Thus, the prosecution did not offer this information to prove that defendant acted in conformity with the past actions; quite the opposite, they were unsolicited responses using defendant's past as an explanation of why there were barriers in place to prevent such actions from happening. Therefore, the evidence does not plainly run afoul of MRE 404(b)(1).

## C. MRE 702

In his Standard 4 brief, defendant asserts that the trial court erred in its gatekeeper function under MRE 702[8] to prevent Horan's inadmissible testimony concerning defendant's truthfulness being presented to the jury. MRE 702 concerns the testimony of experts and Horan was not offered as an expert. Horan testified as a lay person. His testimony was therefore governed under MRE 701, which states:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Defendant appears to argue that Horan's lay opinion testimony was disguised expert testimony because Horan testified to having specialized interviewing techniques and skills aimed at ascertaining the truth of the matter. As defendant acknowledges, Horan was not qualified as an expert at trial. In any event, that did not preclude him, as a lay witness, from offering his personal opinions that were rationally based on his perceptions. MRE 701. The challenged testimony was clearly based on Horan's own perceptions, MRE 701, first-hand personal knowledge, MRE 602, and his training as a detective conducting interviews. Horan's testimony that defendant was not completely truthful with him was not dependent on scientific, technical, or specialized knowledge, but based on his personal perception of defendant's evasiveness and changing version of events to admit more responsibility. The testimony was also important to explain the process of the interview and interrogation techniques to the jury. Therefore, although MRE 702 does not support the admissibility of Horan's statements, defendant has failed to show how it was plain error to admit his statements under MRE 701.

## D. EFFECTIVE ASSISTANCE OF COUNSEL

The defendant offers several arguments regarding ineffective assistance of counsel. We find none persuasive.

Generally, claims of ineffective assistance of counsel involve a mixed question of law and fact. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). This Court reviews a trial court's factual findings for clear error, and any constitutional determinations are reviewed de novo. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004). However, when no evidentiary hearing is held, as is the case here, this Court's review "is limited to mistakes apparent on the record." *People v Riley (After Remand)*, 468 Mich 135, 139; 659 NW2d 611 (2003).

---

[8] MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Defendants have the guaranteed right to the effective assistance of counsel. *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Aceval*, 282 Mich App 379, 386; 764 NW2d 285 (2009). Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *LeBlanc*, 465 Mich at 578. Generally, to establish a claim of ineffective assistance, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). However, such performance must be measured without the benefit of hindsight. *People v LaVearn*, 448 Mich 207, 216; 528 NW2d 721 (1995).

Defendant first argues that counsel was ineffective for failing to object to Horan's references to defendant's participation in sex therapy, defendant's credibility, and comments that vouched for AB. We reject that argument.

Defendant claims that trial counsel should have objected to instances in Horan's testimony where he referred to defendant's credibility. Horan repeatedly offered unsolicited testimony that defendant was not telling the truth. This came after Horan testified that he was trained to ascertain the truth. Because Horan's remarks were not isolated or fleeting and were aimed directly at determining the defendant's guilt or innocence—an issue within the jury's province—it was unreasonable for defense counsel to have not objected. We can find no strategic reason to allow the repetition of such evidence. However, there is no reasonable probability that it affected the outcome of defendant's trial because defendant's own admissions in the interview showed that he had not been truthful during the interview. In other words, the jury did not need Horan's opinion of defendant's lack of candor when defendant's own admissions demonstrated his lack of candor. As a result, defendant cannot demonstrate prejudice related to this issue.

Defendant also argues that trial counsel should have objected to Horan's testimony which suggested to the jury that defendant had previously committed some type of sexual offense. As discussed above, as long as other-acts evidence was not offered for propensity purposes, it does not run afoul of MRE 404(b). *Johnigan*, 265 Mich App at 465. We have found no evidence in the record that the testimony was offered for such purpose. See *Riley*, 468 Mich at 142 ("Ineffective assistance of counsel cannot be predicated on the failure to make a frivolous or meritless motion."). Accordingly, defendant has failed to demonstrate that his attorney's conduct fell below an objective standard of reasonableness, and his claim of ineffective assistance must fail. *Trakhtenberg*, 493 Mich at 51.

## V. TESTIMONY OF DR. PARKIN-JOSEPH

Defendant raises several issues related to the testimony of Dr. Parkin-Joseph. Defendant did not object to Parkin-Joseph's testimony at trial on the grounds asserted on appeal, leaving these issues unpreserved. Accordingly, we review these issues for plain error affecting defendant's substantial rights. *Chelmicki*, 305 Mich App at 62.

### A. WITNESS LIST

In his Standard 4 brief, defendant argues that the prosecution was impermissibly allowed to add Parkin-Joseph to its witness list just days before trial started, in violation of MCR 6.201 and MCL 767.40a(3).

Under MCR 6.201(A)(1), a party upon request must provide the other party "the names and addresses of all lay and expert witnesses whom the party may call at trial." Further, "the witness list may be amended without leave of the court no later than 28 days before trial." MCR 6.201(A)(1). MCL 767.40a(3), in turn, provides that "[n]ot less than 30 days before the trial, the prosecuting attorney shall send to the defendant or his or her attorney a list of the witnesses the prosecuting attorney intends to produce at trial." MCL 767.40a(4), however, allows for the prosecutor to "add or delete from the list of witnesses he or she intends to call at trial at any time upon leave of the court and for good cause shown or by stipulation of the parties."

On March 8, 2019, eleven days before the first day of trial, the prosecution filed its third amended list of known witnesses, this time listing Parkin-Joseph in place of another doctor. There is nothing in the lower court record to indicate that the prosecution ever sought or obtained permission from the trial court to modify its witness list. There also is nothing to indicate that the prosecutor obtained defense counsel's acquiescence in amending the list.

Reversal, however, is not warranted for this error because defendant cannot show that the failure to object to the amended witness list affected the outcome of the trial. Under MCL 767.40a(4), the prosecutor would have been entitled to a good-cause hearing regarding the witness list if defendant had lodged an objection. There is nothing in the text of that statute that would lead us to conclude that had the good-cause hearing gone forward, the trial court would have discovered Parkin-Joseph's allegedly inadmissible testimony. The trial court's purpose in a hearing under MCL 767.40a is to examine whether the prosecutor had a good-faith reason to file an untimely witness list, *not* to conduct an exhaustive inquiry into the witness's expected testimony.

B. MRE 702

Defendant also challenges the admission of Parkin-Joseph's expert testimony under MRE 702.

Parkin-Joseph was qualified without objection as an expert in the area of pediatric sexual assault medicine as well as child development. She therefore offered her testimony as an expert under MRE 702:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *People v Smith*, 425 Mich 98, 112; 387 NW2d 814 (1986), the Court held that the expert's testimony "that the complainant had been sexually assaulted" was not admissible because it "was based, not on any findings within the realm of his medical capabilities or expertise as an obstetrician/gynecologist, but, rather, on the emotional state of, and the history given by, the complainant." The Court explained that the doctor's opinion was merely an opinion on the believability of the complainant's story. *Id*. at 113.

In a more recent case, our Supreme Court held in *People v Harbison*, which was a companion case to *People v Thorpe*, 504 Mich 230, 235; 934 NW2d 693 (2019), that "examining physicians cannot testify that a complainant has been sexually assaulted or has been diagnosed with sexual abuse *without physical*

*evidence that corroborates the complainant's account of sexual assault or abuse* because such testimony vouches for the complainant's veracity and improperly interferes with the role of the jury." (Emphasis added.) The doctor in *Harbison* "candidly acknowledged that her examination of [the victim] showed no physical evidence of an assault," and her conclusion that the victim had suffered " 'probable pediatric sexual abuse' was based solely on her own opinion that [the victim's] account of the assaults was 'clear, consistent, detailed and descriptive.' " *Id*. at 261-262. While relying on *Smith*, the Court noted that the testimony was inadmissible because the jury was in the same position to evaluate the victim's testimony as the doctor. *Id*. at 262.

In contrast to *Smith* and *Harbison*, the admission of Parkin-Joseph's testimony regarding her diagnosis of sexual assault was not erroneous. Parkin-Joseph testified as to her observation that she did not see any physical injuries on AB during the physical examination but, based on her experience, the lack of physical injury did not necessarily exclude the possibility that a sexual assault occurred. Parkin-Joseph also explained that the bruise shown in the picture of AB's genitalia, her urinary tract infection, and the lack of any additional trauma did not prove or disprove that AB was a victim of sexual abuse.

Parkin-Joseph's testimony did appear to go too far when, in response to the prosecutor's question as to her medical diagnosis, she stated: "So basically, again, you know, her exam was normal but that doesn't exclude the possibility of sexual abuse. Again, for all the reasons that we discussed. So with the history that was provided and the details that [AB] was giving to her mother and to the other investigators was for sexual abuse. *Diagnosis was physical—or, sorry, sexual abuse*." (Emphasis added.) The prosecutor did not make further mention of the diagnosis.

However, during defendant's cross examination of Parkin-Joseph, defendant's attorney probed the doctor's unexplored diagnosis. After the prosecutor interrupted defendant's cross examination because the prosecutor was seemingly unaware that the doctor had even made a diagnosis, defendant's attorney took the opportunity to clarify Dr. Parkin-Joseph's earlier testimony and asked, "[w]ould you repeat your diagnosis?" The doctor clarified her earlier "diagnosis" response by saying "[s]o [AB] made a disclosure of sexual abuse and her exam was normal, but that doesn't prove or disprove the possibility of sexual abuse. With [AB's] disclosure, it would be consistent with the diagnosis of child sexual abuse."

Parkin-Joseph went to considerable lengths to acknowledge that AB's allegation of sexual abuse was not proven or disproven by the medical exam but, nevertheless, the child's disclosure could still be consistent with child sexual abuse. Although these isolated answers were awkward and confusing, they were not inadmissible. We therefore find no plain error in the admission of this testimony.

## C. HEARSAY

Defendant also argues that it was improper for Parkin-Joseph to testify regarding what AB's mother had said AB told her. Parkin-Joseph testified:

> So [AB's mother] then asked [AB] if she had been touching down there, if she had been touching herself, and [AB] denied that. She then asked if someone else had touched her [AB] down there, and [AB] replied that her dad had touched her.

> [AB's mother] stated that her—[AB's] stepfather and [defendant] were both referred to by [AB] as dad, so she had to clarify exactly who she was talking about. But

-16-

[AB's mother] reported that she described [defendant] as being the person who—to touch her.

Defendant suggests that AB's statements, as conveyed by her mother, constituted inadmissible double hearsay that was not allowed under MRE 803(4), MRE 803A, or MRE 805.

Assuming AB's statements to her mother were hearsay and that no hearsay exception applied (thereby constituting double hearsay when the mother relayed the statements to Parkin-Joseph), an expert is allowed to recount and rely on hearsay if it was used as a basis to form an opinion. That is because MRE 703 requires that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence." There is no question that Parkin-Joseph's opinion that AB had been sexually assaulted was based, in part, on AB's statements to her mother. "It is well-settled that an expert witness may rely on hearsay evidence when the witness formulates an opinion." *People v Lonsby*, 268 Mich App 375, 382-383; 707 NW2d 610 (2005) (opinion by SAAD, J.). Therefore, because Parkin-Joseph relied on those statements in forming her opinion, they generally would be admissible under MRE 703, despite them being hearsay.

Even if the testimony were inadmissible, defendant must also show that the error affected the outcome of the proceeding. *Carines*, 460 Mich at 763. AB's credibility was of paramount importance because her direct testimony constituted the primary evidence of defendant's guilt. Consequently, AB's statements to her mother acted to corroborate AB's direct testimony. When "a hearsay statement is not offered and argued as substantive proof of guilt, but rather offered merely to corroborate the child's testimony, it is more likely that the error will be harmless." *People v Gursky*, 486 Mich 596, 620; 786 NW2d 579 (2010). If the only evidence against defendant were AB's testimony, it might be tempting to conclude that the evidence of her statements to her mother may have influenced the jury. But vitally, there was other evidence to implicate defendant—defendant's own admissions. While defendant denied any penetration with AB, he admitted to putting his hand down AB's pants and underwear, and touching her bare genital area purportedly to see if she had wet the bed. Aside from the claim being dubious on its face, the genuineness of defendant's claim is belied by his admission that (1) he should not have left his finger on AB for as long as he did, and (2) he expressed remorse about his actions. Given defendant's admitted actions and his feeling of remorse, the jury could easily conclude that AB's testimony, without relying on AB's statements to her mother, was credible.

## D. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant additionally contends that trial counsel was ineffective for failing to object to Parkin-Joseph's late addition to the witness list and her diagnosis of AB having been sexually abused. We disagree.

Generally, claims of ineffective assistance of counsel involve a mixed question of law and fact. *LeBlanc*, 465 Mich at 579. This Court reviews a trial court's factual findings for clear error, and any constitutional determinations are reviewed de novo. *Matuszak*, 263 Mich App at 48. However, when no evidentiary hearing is held, as is the case here, this Court's review "is limited to mistakes apparent on the record." *Riley*, 468 Mich at 139. To establish a claim of ineffective assistance, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Trakhtenberg*, 493 Mich at 51.

As discussed earlier, the prosecution named Parkin-Joseph as a witness just a few days before trial without leave of court and without stipulation from defendant. Defendant argues that Parkin-Joseph's late addition to the witness list should have raised red flags of unfairness and due process prompting defense counsel to look at the court rule, and further the expert opinion testimony that AB was sexually abused was damming and foreclosed defendant's innocence.

However, as discussed above, defendant cannot demonstrate that an objection to the witness list would have led to discovery of Parkin-Joseph's proffered opinion or the exclusion thereof. Had defendant objected, the prosecutor would have been entitled to a good-cause hearing under MCL 767.40a(4). In such a hearing, the trial court's role is to determine whether the prosecutor had a good-faith reason to untimely file the witness list, not to inquire into the specifics of the witness's testimony. Accordingly, even though defendant's attorney should have objected to the untimely witness list, the failure to object did not have a reasonable probability of affecting the outcome of the trial. See *Trakhtenberg*, 493 Mich at 51.

Defendant's argument that his attorney rendered ineffective assistance by failing to object to Parkin-Joseph's testimony regarding "diagnosis" is also unpersuasive. As discussed earlier, that testimony, while potentially awkward or confusing, was admissible. Parkin-Joseph properly testified she did not observe physical injuries on AB, and the lack of such injuries was not evidence that no sexual assault occurred. Parkin-Joseph also testified on direct examination, however, that she made a diagnosis of sexual assault on the basis of reports from law enforcement and AB's mother. Parkin-Joseph later clarified on cross-examination that AB "made a disclosure of sexual abuse and her exam was normal, but that doesn't prove or disprove the possibility of sexual abuse." According to Parkin-Joseph, such a disclosure "would be consistent with the diagnosis of child sexual abuse." This clarifying answer did not improperly vouch for AB's veracity. Accordingly, defendant cannot show that his attorney was ineffective for failing to object.

## VI. TIPTON'S TESTIMONY

### A. PROSECUTORIAL MISCONDUCT

Defendant argues that the prosecutor committed misconduct in eliciting evidence of his "prior acts" from defendant's girlfriend, Stephanie Tipton. This issue also is unpreserved because defendant did not object to the challenged testimony at trial. *Aldrich*, 246 Mich App at 116. Accordingly, to be entitled to relief, defendant must demonstrate a plain error affecting his substantial rights. *Carines*, 460 Mich at 763.

When the prosecutor attempted to get Tipton to acknowledge that she could not possibly have always been with defendant and AB at all times, Tipton maintained that she always was present because defendant "has a prior and he knows that he is at risk of being pointed at for something like this." Defendant claims that this reference was inadmissible and deprived him of a fair trial. Evidence of prior acts are not admissible to prove that the person acted in conformity with those past acts. MRE 404(b)(1). This rule "represents the deeply rooted and unwavering principle that other-acts evidence is inadmissible for propensity purposes." *Denson*, 500 Mich at 397. However, as long as the other-acts evidence was not offered for propensity purposes, it does not run afoul of this rule. *Johnigan*, 265 Mich App at 465.

There is no evidence in the record that the prosecutor intended to solicit and admit Tipton's response. There was no notice of intent filed and no motion made at trial for the admission of the testimony. Rather, the statement was volunteered by Tipton for the purpose of proving or explaining how defendant could not have committed the alleged crimes. This is the antithesis of propensity evidence, which makes them not objectionable under MRE 404(b)(1). See *Johnigan*, 265 Mich App at 465.

## B. INEFFECTIVE ASSISTANCE

Defendant argues that trial counsel was ineffective by not objecting to Tipton's testimony which suggested to the jury that defendant had previously committed some type of sexual offense. We disagree.

As previously discussed, claims of ineffective assistance of counsel involve a mixed question of law and fact. *LeBlanc*, 465 Mich at 579. This Court reviews a trial court's factual findings for clear error, and any constitutional determinations are reviewed de novo. *Matuszak*, 263 Mich App at 48. However, when no evidentiary hearing is held, as is the case here, this Court's review "is limited to mistakes apparent on the record." *Riley*, 468 Mich at 139.

To establish a claim of ineffective assistance, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

Counsel's failure to object to Tipton's testimony that defendant had "a prior" and "knows that he is at risk of being pointed at for something like this," did not fall below an objective level of reasonableness. When other-acts evidence is offered for a purpose other than to show that defendant acted in conformity with his past behavior, the evidence is not objectionable and is properly admitted by the trial court. See *Johnigan*, 265 Mich App at 465. As we explained above, the testimony by Tipton was offered to show that defendant could not have committed the crimes against AB. The testimony was not offered to show that defendant acted in conformity with his past bad acts. Thus, defendant's attorney did not render ineffective assistance for failing to object to Tipton's testimony. Moreover, defendant's attorney may well have had a good reason for not objecting in that doing so would have brought undue attention to defendant's past crimes. On this basis, we cannot conclude defendant was denied the effective assistance of counsel.

## VII. PROSECUTORIAL MISCONDUCT

In his Standard 4 brief, defendant argues that the prosecutor impermissibly vouched for the credibility of AB during closing argument. We disagree.

"We review claims of prosecutorial misconduct case by case, examining the remarks in context, to determine whether the defendant received a fair and impartial trial." *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001). "[A] defendant's unpreserved claims of prosecutorial misconduct are reviewed for plain error." *Id*. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Carines*, 460 Mich at 763. "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*.

During closing argument, the prosecutor made the following comments:

Back on Tuesday [the first day of trial], I had originally talked to you—to you all about what these types of cases are all about. It's who are you going to believe. Are you going to believe the child's testimony that it had occurred, that the story that *my side of the fence* provided to you, or are you going to believe that it didn't happen[?]

* * *

And when [defendant admitted to lingering with his finger on AB], coupled with [AB's] testimony of how she remembers it happening, which one makes more sense to you? Which one appeals to the common sense of your own minds? *I believe* that [AB's] does. [Emphasis added].

Defendant claims that these comments, specifically the italicized language, impermissibly vouched for the credibility of AB. It is well established that a prosecutor may not vouch for the credibility of witnesses by implying she has some special knowledge of the witnesses' truthfulness. *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004). Nor can a prosecutor place the prestige of her office behind the testimony of witnesses. *People v McGhee*, 268 Mich App 600, 633; 709 NW2d 595 (2005). However, a prosecutor can argue that a witness is credible, especially when "the question of guilt depends on which witnesses the jury believes." *Thomas*, 260 Mich App at 455. "A prosecutor generally has great latitude regarding their arguments and conduct and is free to argue the evidence and all reasonable inferences therefrom as it relates to their theory of the case." *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). Further, jurors may use their own common sense and experience in the affairs of life as they analyze evidence. See CJI2d 3.5(9) and CJI2d 2.6(2).

Regarding the first comment, defendant takes exception to the prosecutor's reference to "my side of the fence" and asserts that this reflects the placement of the prestige of the prosecutor's office behind AB's testimony. This assertion is without merit. The prosecutor was not placing the prestige of her office behind AB's testimony, but instead was merely using colloquial language to describe the fact that it was the prosecution's theory, i.e., "their side of the fence," as opposed to the defendant's side, that defendant had assaulted AB. Concerning the second comment, defendant argues that it was improper for the prosecutor to inject her personal beliefs as to AB's truthfulness when stating, "I believe." "The propriety of the prosecutor's comments does not turn on whether or not any magic words are used." *People v Reed*, 449 Mich 375, 399; 535 NW2d 496 (1995) (quotation marks and citation omitted). "The crucial inquiry is not whether the prosecutor said 'We know' or 'I know' or 'I believe,' but rather whether the prosecutor was attempting to vouch for the defendant's guilt." *Id*. "Where the prosecutor's argument is based upon the evidence and does not suggest that the jury decide the case on the authority of the prosecutor's office, the words 'I believe' or 'I want you to convict' are not improper." *People v Swartz*, 171 Mich App 364, 370-371; 429 NW2d 905 (1988). Looking at the prosecutor's comments as a whole, it is evident that the prosecutor's overarching argument was that AB was credible, not because of any personal insight, but because of the evidence, which is permissible. See *Unger*, 278 Mich App at 240. Accordingly, there is no plain error.

## VIII. SENTENCING

Finally. defendant challenges his sentence arguing that the trial court erred by improperly scoring Offense Variable 3 (OV 3) and Offense Variable 4 (OV 4). We disagree.

This Court is reviews a trial court's factual determinations with respect to the scoring of offense variables for clear error, and those findings must be supported by a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). A factual finding is clearly erroneous when the reviewing court is left "with a definite and firm conviction that a mistake has been made." *People v McElhaney*, 215 Mich App 269, 273; 545 NW2d 18 (1996).

Defendant contends the trial court should have assessed only five points for OV 3 because there was no evidence that medical treatment was required for any of AB's injuries.[9] OV 3 addresses "physical injury to a victim." MCL 777.33(1). Pertinent to this case, 10 points are proper if "[b]odily injury requiring medical treatment occurred to a victim," MCL 777.33(1)(d), five points are proper if the victim suffered bodily injury not requiring medical treatment, MCL 777.33(1)(e), and zero points are to be assessed if "[n]o physical injury occurred to a victim," MCL 777.33(1)(f).

At the hearing on defendant's motion for resentencing, the trial court found that OV 3 was properly scored at 10 points. The trial court, relying on *People v McDonald*, 293 Mich App 292; 811 NW2d 507 (2011), noted how 10 points was properly assessed in that case when the victim of a sexual assault suffered an infection unrelated to a sexually transmitted disease. The trial court then concluded that consistent with *McDonald*, 10 points was proper in this case, because AB suffered a urinary tract infection after the sexual assault.

The trial court's implicit finding that defendant's sexual assault on AB caused physical injury requiring medical treatment was not clearly erroneous. Although Parkin-Joseph testified that such an infection is not abnormal for "little girls" and not necessarily indicative of sexual abuse, the presence of the infection could be evidence of an assault. On the basis of this testimony, coupled with the temporal closeness of the sexual assault and infection, the trial court did not clearly err in finding that the sexual assault caused the infection. Accordingly, the trial court properly assessed 10 points for OV 3. See *McDonald*, 293 Mich App at 298 (affirming the trial court's assessment of 10 points for OV 3 because the evidence "established that the victim suffered an infection as a consequence of the rape." ).

Next, defendant argues the trial court should not have assessed 10 points for OV 4 because there was no evidence AB suffered psychological injury requiring professional treatment. MCL 777.34(1). Ten points are proper under this offense variable if "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(a). On the other hand, if "[n]o serious psychological injury requiring professional treatment occurred to a victim," then zero points are appropriate. MCL 777.34(1)(c).

In assessing 10 points for OV 4, the trial court found that AB had sought mental health treatment, supporting the conclusion that AB had suffered from a serious psychological injury. Thus, the court's finding that AB had been seeking mental health treatment was not clearly erroneous. The trial court heard testimony that AB had seen several therapists and counselors following the assault. The court's ultimate factual finding—that AB had suffered a serious psychological injury—was not stated but nonetheless was implicit in its ruling. The evidence that AB sought mental health treatment, coupled with the evidence that AB now has no memory of what transpired, is indicative of a serious psychological injury requiring

---

[9] The trial court assessed 10 points for OV 3.

professional treatment.  Consequently, the trial court did not clearly err in finding AB suffered "[s]erious psychological injury requiring professional treatment occurred to a victim."  See MCL 777.34(1)(a).[10]

     Affirmed.

/s/ Kirsten Frank Kelly
/s/ Thomas C. Cameron

---

[10] Defendant also argues that even if none of the errors present, standing alone, warrant reversal, the cumulative effect of all of the errors require this Court to reverse his conviction.  See *People v Hill*, 257 Mich App 126, 152; 667 NW2d 78 (2003) ("The cumulative effect of several minor errors may warrant reversal even where the individual errors in the case would not warrant reversal.").  Even if errors occurred as discussed above, we cannot say that their cumulative effect deprived defendant of a fair trial.